# Illinois Official Reports

## Appellate Court

---

### *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B

---

| | |
|---|---|
| Appellate Court Caption | JACOB SZAFRANSKI, Plaintiff-Appellant, v. KARLA DUNSTON, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket Nos. 1-12-2975, 1-14-1539 cons. |
| Filed | June 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-29654; the Hon. Sophia H. Hall, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Schiller, DuCanto & Fleck, LLP, of Chicago (Brian A. Schroeder, of counsel), for appellant.<br><br>K&L Gates, LLP, of Chicago (Abram I. Moore, Molly K. McGinley, and Sara E. Fletcher, of counsel), for appellee. |
| Panel | JUSTICE LIU delivered the judgment of the court, with opinion.<br>Presiding Justice Simon concurred in the judgment and opinion.<br>Justice Harris dissented, with opinion. |

¶ 1       This is the second appeal in a case that requires us to settle the dispute over who is entitled to control the disposition of cryopreserved pre-embryos created jointly by the parties.

¶ 2       In 2010, plaintiff, Jacob Szafranski, and defendant, Karla Dunston, entered into an agreement to undergo *in vitro* fertilization (IVF) together for the purpose of creating pre-embryos. Karla had been diagnosed with lymphoma and was expected to suffer ovarian failure and infertility as a result of her chemotherapy treatment. During the IVF procedure, Jacob and Karla agreed to fertilize all of the eggs that were retrieved. Jacob deposited his sperm for the IVF and three viable pre-embryos were created and frozen. After their relationship ended, the parties disagreed over whether Karla could use the pre-embryos. Jacob sued to enjoin Karla from using them, and Karla filed a counterclaim seeking sole custody and control over the pre-embryos. Following a hearing on the parties' motions for summary judgment, the circuit court awarded Karla sole custody and control of the pre-embryos and the right to use them to have children.

¶ 3       In its ruling, the circuit court explained that Karla was entitled to use the pre-embryos because her interests prevailed over Jacob's competing interests. Jacob appealed the ruling and this court issued an opinion in *Szafranski v. Dunston*, 2013 IL App (1st) 122975 (*Szafranski I*). Following an extensive survey of Illinois law and that of other jurisdictions involving similar disputes, we held that disputes over the disposition of pre-embryos created with one party's sperm and the other party's ova should be settled by: (1) honoring any advance agreement entered into by the parties, and (2) weighing the parties' relative interests in using or not using the pre-embryos in the event there is no such agreement. *Id.* ¶¶ 40, 42. We reversed, and remanded the cause with directions to apply this hybrid approach to resolve the dispute and to allow the parties to conduct additional discovery under this approach.

¶ 4       On remand, the circuit court held a two-day trial, after which it entered judgment in favor of Karla. The court found that Jacob and Karla had an oral contract allowing Karla to use the pre-embryos without Jacob's consent, and rejected Jacob's assertion that the medical informed consent document signed by the parties modified or contradicted their oral contract. Alternatively, the court ruled in favor of Karla under the balancing-of-interests test. Karla was awarded sole custody and control of the pre-embryos. Jacob now appeals from that judgment.

¶ 5       We affirm the circuit court's judgment. The evidence at trial supported the circuit court's finding that the parties formed an oral contract on March 24, wherein they agreed to create pre-embryos that Karla could use to have a biological child. We also agree that the parties did not modify this contract when they signed the medical informed consent document on March 25. Finally, we cannot say that the court erred in finding that Karla's interests prevail over Jacob's interests in this dispute, based on evidence in the record that the pre-embryos represent Karla's last and only opportunity to have a biological child with her own eggs.

¶ 6                                    BACKGROUND

¶ 7       Jacob and Karla first met in 2001. Jacob is a firefighter, paramedic, and registered nurse. Karla is a physician who practices emergency medicine. The two began dating in November 2009, around the time that Jacob and his prior girlfriend, Ashley, ended their two-year relationship. Neither Jacob nor Karla expected their relationship to result in marriage. Karla

testified that their relationship had no long-term prospects; Jacob agreed that he doubted their relationship when they were together, noting that they had problems and would fight.

¶ 8    In mid-March of 2010, Karla was diagnosed with non-Hodgkin's lymphoma. Her oncologist recommended that she undergo chemotherapy, but told Karla that she would "most likely" lose her fertility as a result of the treatment. Karla was "devastated" and considered this news to be "just as bad as learning that [she] had cancer." She "thought about how much [she] wanted to be a mother" and "immediately thought about [her] father," who died when she was five years old, and "about how [she] wanted to have a grandchild *** with part of him." When Karla told Jacob how important it was for her to have children, Jacob "was very supportive."

¶ 9    Karla subsequently met with a fertility specialist "at [her] hospital," who confirmed the oncologist's belief that she would likely lose her fertility. The specialist recommended that Karla consult with Dr. Ralph Kazer, a fertility specialist with the Northwestern Medical Faculty Foundation (Northwestern). Karla testified that, by this time, her tumor was causing her "a lot of pain." Her oncologist insisted that she start chemotherapy immediately. However, Karla postponed her chemotherapy treatment to explore IVF because of "how much [she] wanted to be a mother and have a biological child."

¶ 10    Karla met with Dr. Kazer on March 24, 2010. During this meeting, Dr. Kazer told Karla that she would likely lose her fertility during chemotherapy. Dr. Kazer then discussed options for having a biological child in the future, including freezing her eggs or creating embryos to be frozen. He also informed Karla about the option of using an anonymous sperm donor and even provided her with a list of sperm banks. Karla testified that she was "nervous" about using an anonymous sperm donor.

¶ 11    After their meeting, Karla called Jacob and told him about her options. Jacob was at work and took his cell phone into the bathroom to talk. Karla told Jacob that the plan was to retrieve a large number of eggs, fertilize a portion, and then freeze the resulting pre-embryos while she underwent her chemotherapy treatment. Karla asked if he would "be willing to provide sperm to make pre-embryos with her." He responded "yes," telling Karla that he wanted to help her have a child.

¶ 12    The next day, on March 25, 2010, Jacob and Karla met with the staff at Northwestern, including Dr. Kazer, nurses, a financial counselor, and a psychologist, Dr. Susan Klock. During this appointment, Jacob deposited sperm to be frozen and used for the IVF procedure.

¶ 13    At their March 25 meeting with Dr. Kazer, Jacob and Karla signed the Northwestern "Informed Consent for Assisted Reproduction" (the Informed Consent). The 21-page Informed Consent contains seven sections, the majority of which explain the procedures and risks for IVF treatments to the mother and to the potential offspring. A section on page seven requires the parties to designate the number of eggs they wanted fertilized; in this section is a handwritten reference indicating the parties' initial plan to "split" the retrieved eggs so that half would be fertilized and the other half would be frozen. This directive, however, was not initialed by the parties.

¶ 14    The Informed Consent provides that "[p]atients/couples who have frozen embryos must remain in contact with NMFF on at least an annual basis in order to inform NMFF of their wishes as well as to pay fees associated with the storage of their embryos."

¶ 15    Pages 11 and 12 of the Informed Consent then explain Northwestern's legal rights and obligations as follows:

"Because of the possibility of you and/or your partner's separation, divorce, death or mental incapacitation, it is important, if you choose to cryopreserve your embryos, for you to decide what should be done with any of your cryopreserved embryos that remain in the laboratory in such an eventuality. Since this is a rapidly evolving field, both medically and legally, the clinic cannot guarantee what the available or acceptable avenues for disposition will be at any future date. At the present time, the options are:

1) discarding the cryopreserved embryos

2) donating the cryopreserved embryos for approved research studies.

3) donating the cryopreserved embryos to another couple in order to attempt pregnancy.

Embryos are understood to be your property, with rights of survivorship. No use can be made of these embryos without the consent of both partners (if applicable).

a) In the event of divorce or dissolution of the marriage or partnership, NMFF will abide by the terms of the court decree or settlement agreement regarding the ownership and/or other rights to the embryos.

b) In the event of the death or legal incapacitation of one partner, the other partner will retain decision-making authority regarding the embryos.

c) In the event both partners die or are legally incapacitated, or if a surviving partner dies or is legally incapacitated while the embryos are still stored at NMFF, the embryos shall become the sole and exclusive property of NMFF. In this event, I/we elect to: (please select and initial your choice). Note: both the patient and the partner must agree on disposition; as with other decisions relating to IVF, you are encouraged to discuss this issue."

Below this paragraph, Karla and Jacob initialed the space next to the option to "[d]onate the embryos to another couple."

¶ 16        Included on page 17 of the Informed Consent is an additional legal disclaimer:

"The law regarding IVF, embryo cryopreservation, subsequent embryo thaw and use, and parent-child status of any resulting child(ren) is, or may be, unsettled in the state in which either the patient, spouse, partner, or any current or future donor lives, or in Illinois, the state in which the NMFF Program is located. NMFF does not provide legal advice, and you should not rely on NMFF to give you any legal advice. You should consider consulting with a lawyer who is experienced in the areas of reproductive law and embryo cryopreservation as well as the disposition of embryos, including any questions or concerns about the present or future status of your embryos, your individual or joint access to them, your individual or joint parental status as to any resulting child, or about any other aspect of this consent and agreement."

¶ 17        The last page of the Informed Consent contains the signatures of Jacob, Karla, and Dr. Kazer and the date of March 25, 2010. Above their signatures is the following provision:

"After your questions have been answered to your satisfaction, please sign your names below to indicate that you have had adequate time to review the information contained in this consent form and that you are ready to begin your upcoming IVF treatment cycle."

¶ 18        Later that day, following their appointment at Northwestern, Jacob and Karla met with Nidhi Desai, an attorney, to discuss the IVF procedure and their options for the pre-embryos.

Desai presented the couple with two possible arrangements: a co-parenting agreement or a sperm donor agreement. Desai explained that, under a co-parenting agreement, Jacob would be involved in any resulting child's life as a co-parent, including sharing financial responsibility. She also explained that, under a sperm donor agreement, Jacob would have no obligations and would be waiving his parental rights. Desai informed the parties that if they wanted to use a sperm donor agreement, each party would require independent legal representation and they would have to hire an additional attorney for this purpose. Desai did not present Jacob and Karla with any draft agreements during their initial consult; rather, they were supposed to call her afterwards to tell her which arrangement they had chosen.

¶ 19 On March 29, 2010, Desai received an e-mail from Karla stating that the couple had opted to proceed under a co-parenting agreement. Desai prepared and e-mailed Karla a document entitled "Co-Parent Agreement" later the same day. This proposed agreement was never signed.

¶ 20 On April 6, 2010, the parties went together to Northwestern, where Karla underwent the egg retrieval procedure and Jacob made his second deposit of sperm. Following the procedure, Dr. Kazer informed them that he had retrieved fewer eggs than originally anticipated and advised them that they would have a better chance of having a biological child if they fertilized all eight. Karla asked Jacob, "[W]hat should we do?" Jacob indicated to her that they should fertilize all of the eggs with his sperm. Ultimately, only three eggs were successfully fertilized.

¶ 21 The next day, Karla began her chemotherapy treatment. Jacob attended her first appointment and, initially, was "a hundred percent supportive." Subsequently, however, he stopped returning her phone calls and text messages. In May, after Karla's second chemotherapy cycle, Jacob ended their relationship in a text message. Karla responded with an inquiry about the pre-embryos, but received no response.

¶ 22 On June 14, 2010, Jacob sent Karla an e-mail for the first time after ending their relationship. In his e-mail, he stated: "I still have many questions to ask myself along with all the things I'd like to ask you. So with that being said I feel I should tell you what has been going on in my mind and life over these past few months in attempt to bring closure to what has happened between us so far." He acknowledged that there were differences that he could not reconcile and even though Karla was unaware of these issues, he knew they ultimately "could not be together." He also admitted in the e-mail that he had concealed from her his true feelings and reservations about their relationship while simultaneously seeking a way to end it that would leave her "in a position to move on intact despite the loss of [their] relationship." In a paragraph describing his concerns about their separation and their pre-embryos, he wrote:

> "When you asked me if I would be the donor for your emergent egg harvesting I still have no reservations in my answer. If you desired to have the possibility of having 'a' child in the future and I could be of help to you, I'd do it all over again. But now that we've already gone through with everything I wonder if you in asking me were doing so out of a longing to have 'my' child instead. The two are very different things, things neither you nor I were clear upon, because we never discussed our thoughts and feelings when given such choices. Karla I rather desired you to have a child of your own in the future with the return of your health, not for us to have a child when that time comes. I know now that there isn't a possibility of a future for us together and that our relationship has faltered. I wonder if you would've rather gone with a random donor in knowing this, a question that my indecision has robbed you of, even in spite of

my assumed generosity and caring actions. I'm sorry for this and I hope you can forgive me even after everything I've put you through. Now in the after math [*sic*] of that decision I'm faced with even more compounding issues all stemming from my fear of the truth. Karla do you still wish to keep the embryo's [*sic*] after all of this? Do you desire the potential to have 'a' child in the future or 'my' child, because if your choice is the ladder [*sic*] I won't be there? I had no intention of being there. I ask myself, would you have asked someone instead of me if I had said no, or would you have even gone through with it at all? It's far too late to be saying this, but you and I both know we never had the needed time to make such a decision and rather hastily went about things due to your health."

¶ 23    Jacob also expressed concern about the reaction he had received from his friends and family when discussing the fact that he had participated in the IVF process with Karla:

"I never imagined that what I'm saying to you right now would be so expansive and reaching in my life Karla. My time with you has worked its way into every part of my being with everything and everyone I know. Since I stopped returning your text's [*sic*] and calls I looked for council [*sic*] from just about everyone I could, and have been met with mixed feelings to say the least. Some of my friends and family feel I've made a grave mistake and did something that is unnatural and that I should not go through with. Others feel the same as I do and believe I did what was best given the circumstances and acted with the utmost of intentions. However, I never imaged [*sic*] that my choice would be one that would forever push me away from those people I've been so close to in my life. *** I know that I must make a choice in this and choose to leave it up to you ultimately to decide Karla."

¶ 24    Finally, he acknowledged a fear of being rebuked or rejected for having helped Karla:

"I just am afraid that this will be something that haunts me for the rest of my life and that once I do find someone who I'm ready to love and have a family with they will reject me on the basis that I could potentially have a child of my own in the world with another women [*sic*], that I know nothing about and neither of which have I ever loved. The thought of a child being a mutually desired choice in the shared life and relationship of two loving adults is something very fundamental and non-negotiable to some people. I just wonder if my future happiness in life will be tethered to the women [*sic*] I cared for years ago and the child I never knew."

¶ 25    On September 6, 2010, Jacob sent Karla another e-mail, announcing that he could not let her use the pre-embryos and that he wanted them to be donated to science or research. In her e-mail back to Jacob that same day, Karla responded: "Those embryos mean everything to me and I will fight this to the bitter end." On September 10, 2010, Jacob sent Karla an e-mail, telling her that "if [she] could put together all the documents that [he] would need to sign over the embryos [he'll] do it." He also asked her to "mail all correspondence" to a different address and to refrain from replying to his e-mail message because "other people routinely access [his] email and will ultimately make this a harder decision for [him] to make."

¶ 26    Karla contacted Desai about drafting a sperm donor agreement, and Desai told her that Jacob would need to sign a waiver and obtain separate legal representation. Desai recommended an attorney for Jacob. The attorney later informed Desai that she and Jacob did not connect for a time, but when they did, Jacob said he "did not want to move forward with the arrangement."

¶ 27    Jacob subsequently hired an attorney, Kurt Mueller, who sent a document entitled "Sperm Donation and Confidentiality Agreement" to Karla's attorney on April 29, 2011. The proposed agreement granted Karla full custody of the pre-embryos and required, among other things, that Jacob's identity as the sperm donor remain confidential. Jacob, however, later discharged Mueller and sent his own "proposed anonymous embryo donation and confidentiality agreement" which also included a provision granting Karla full custody of the pre-embryos. Karla testified that she would have signed Jacob's proposed agreement, but Northwestern indicated that it would not abide by its terms.

¶ 28    On August 22, 2011, Jacob filed the underlying lawsuit against Karla.[1]

¶ 29                                    The Trial

¶ 30    The trial evidence included the in-court testimony of Jacob and Karla and the deposition testimony of Dr. Kazer, Nidhi Desai, and Ashley Harris, Jacob's former girlfriend. Among the documents admitted into evidence were the following: the Informed Consent dated March 25, 2010; the draft Co-Parent Agreement prepared by Desai on March 29, 2010; and the e-mails between Jacob and Karla, along with the attachments to the e-mails.

¶ 31                               Jacob's Testimony

¶ 32    Jacob testified that he responded "yes" when Karla asked him on March 24 if he would "would be willing to provide sperm to make pre[-embryos] with her." He admitted telling Karla that he wanted to help her have a child, and acknowledged that the purpose of providing his sperm was to help her have a biological child. He agreed that they never discussed any limitations on her future use of the pre-embryos. In fact, the thought of placing limitations on Karla's use of the pre-embryos "never crossed [his] mind."

¶ 33    As for the Informed Consent, Jacob acknowledged that the purpose of the document was "[p]artly" to protect Northwestern from committing a crime in the event it touched him, conducted tests on him, or disclosed his medical information. He nonetheless understood the Informed Consent as requiring both his and Karla's approval prior to any use of the pre-embryos. He admitted that he never communicated this understanding to Karla.

¶ 34    Jacob testified that, during their March 25 meeting, Dr. Kazer told the couple that any use of the pre-embryos would require the consent of both individuals because they were not married; however, he acknowledged that Dr. Kazer never asked the parties to agree what should happen to the pre-embryos in the event of their separation. Instead, Dr. Kazer encouraged them to go see an attorney to resolve that issue and indicated that Northwestern would abide by an agreement, prepared by an attorney, regarding custody of the pre-embryos.

¶ 35    Jacob acknowledged that despite the couple's initial plan to fertilize some of Karla's eggs and to cryopreserve the rest of them, he agreed that Karla should fertilize all eight eggs after Dr. Kazer indicated that there would be a better chance of creating viable pre-embryos if all the eggs were fertilized. Jacob knew that these were likely the last viable eggs Karla would ever have because of the anticipated effects of her chemotherapy treatment.

_____

[1]Northwestern Medical Faculty Foundation, the medical practice that issued the Informed Consent and had initial responsibility for the clinical storage of the cryopreserved embryos, is not a party in this lawsuit.

¶ 36    Jacob agreed that, during the meeting with Desai, no one ever identified any circumstances under which Karla would not be able to use the pre-embryos. However, he explained that he did not voice any such limitations because he "wasn't asked" and assumed that his prior approval was required under the terms of the Informed Consent. Jacob denied ever agreeing to sign the draft Co-Parent Agreement that Karla emailed to him. He testified that at most, he merely told Karla that he had been "meaning to" sign it. He did not express any concerns or disagreements with the document's terms, but indicated only that the couple would need to go over the document and talk about it. He testified that he never agreed to any term in the draft agreement that would give Karla sole control over the disposition of the pre-embryos in the event of their separation; in fact, he believed that it contradicted what Desai told him his rights would be as a co-parent and also what he agreed to in the Informed Consent.

¶ 37                                    Karla's Testimony
¶ 38    Karla testified that she believed, on March 24, that she and Jacob had reached an agreement that "Jacob was providing sperm to create embryos so [she could] have a biological child after [her] cancer treatment." She noted that Jacob agreed to donate his sperm "[w]ithout hesitation" and had expressed no doubt whatsoever about creating the pre-embryos. Karla testified that she was "relieved and so happy and so thankful" that Jacob had agreed to help her have biologically related children. Karla also testified that it was her understanding that she and Jacob "always agreed that he was doing this to help [her] create embryos to have a biological child with no other attachment." She believed that she had his consent to use the pre-embryos at a later date, noting, "that's why I fertilized all eight [eggs]." Had she known that Jacob harbored doubts or concerns, she "would have gone against Dr. Kazer's suggestion and *** frozen some eggs" in order "to make sure that there was no risk of [her] being able to have a biological child after [her] cancer treatment."

¶ 39    Karla does not remember discussing the disputed provision in the Informed Consent regarding the use of the pre-embryos when meeting with Dr. Kazer on March 25. Karla testified that she uses informed consent forms in her own medical practice and believes they are "given to a patient to describe a procedure, to discuss the risks and benefits of doing the procedure, and to get permission for a hospital and doctor to do a procedure." She also testified that the couple had "already agreed that [Jacob] was going to donate his sperm to create embryos"; no one asked them about this agreement; they were told "on several occasions" that day about the need to document their wishes with an attorney; and she had no opportunity to modify the provision.

¶ 40    Karla acknowledged that she never asked to modify the Informed Consent so as to indicate her specific understanding that she had sole authority over the pre-embryos, but explained why she did not do so. First, she was "very familiar with informed consents *** [and] knew that this wasn't something that you modify or write in what a patient wishes." Second, it was her understanding that she and Jacob would be documenting their wishes through an attorney as opposed to in the informed consent. And lastly, she and Jacob "agreed that he was donating the sperm for one reason and one reason only, for [her] to have biological children after [her] cancer treatment." She testified that "there was really no need to ask for that term to be put into a form" in light of their oral agreement and understanding of the purpose of the IVF.

¶ 41    With respect to the March 25 consultation with Desai, Karla testified that "every discussion that [the couple] had including the discussion with Nidhi Desai [was] that Jacob

was doing this for [her] to have a biological child, and no other conditions, no other terms were ever mentioned." Although Karla sent Desai the e-mail requesting the co-parenting agreement, she did not review the draft Co-Parent agreement that Desai sent to her upon her receipt of the document. Karla explained that during this time, she was experiencing great pain, difficulty with breathing and eating, undergoing injections and ultrasound exams for the IVF, and managing her fears about her mortgage, student loans, and bills in light of the fact that she would probably not be working for almost a year: "So that's where all my time was spent. That's why I was stressed and that's what I was going through at the time."

¶ 42    Karla testified that when she asked Jacob, following the retrieval, whether they should fertilize all eight eggs with his sperm, she remembers this moment specifically because "[i]t was a big deal *** we were fertilizing all eight, and I knew that it was my–the only way that I would be able to have biological children." She testified that Jacob "never once" mentioned any problems when he told her to fertilize all eight eggs.

¶ 43    At one point, following her first chemotherapy treatment, she and Jacob went to a pharmacy to pick up some prescriptions. While Jacob was paying for the prescriptions, she asked him if he had read the Co-Parent Agreement and if he was going to sign it. She recalled Jacob telling her "yes" and she felt "relieved." At that time, Karla "thought [Jacob] was so amazing" and that he "was this angel that was put in [her] life to help [her] through this."

¶ 44                          Dr. Ralph Kazer's Testimony

¶ 45    Dr. Kazer testified that he does not remember the meeting with Jacob and Karla on March 25, but that it is "highly likely" that he pointed out the consent provision to them during their meeting. Dr. Kazer testified that Northwestern has used a version of the Informed Consent since the IVF program started in the early 1990s. It has been updated and revised over the years, and the version signed by Jacob and Karla was current as of December 2009.

¶ 46    According to Dr. Kazer, the purpose of a medical informed consent document is "to provide a vehicle for systematically explaining to a patient who is considering a particular treatment the nature of the treatment, the potential advantages of the treatment, the potential disadvantages of the treatment, and the particular consequences of the treatment in order that the patient can make an informed decision about whether or not undergoing this particular kind of therapy is appropriate for him or her." He agreed that the Informed Consent does not necessarily serve to document the parties' wishes with respect to disposition of the pre-embryos. As he explained: "[W]e don't feel that it would be appropriate to go to that individual level of detail in a standard consent form. Every couple is likely to handle this in a different way and we feel that it's more appropriate for them to get legal counsel to document their specific desires about disposition, and in particular, if they ultimately split up."

¶ 47    Dr. Kazer testified that a couple could modify the Informed Consent "in principle" if they "changed [their] mind about something." In this particular case, however, Jacob and Karla would not have been permitted to modify the consent provision at issue if they disagreed with it. Dr. Kazer would have told them that "this is the only consent form that they can sign; that they can't modify it, and if they had some sort of agreement between the two of them about the disposition of their embryos in the future, that they needed to get an attorney and document it in a separate document." Finally, Dr. Kazer noted that this has "never happened to [him] in [his] career."

¶ 48                          Nidhi Desai's Testimony

¶ 49        Nidhi Desai specializes in adoption and reproductive technology law. Desai met with Jacob and Karla on March 25, 2010 for about an hour, and discussed "the emergency IVF" and "different options with respect to the [pre-]embryos." She also discussed with them the options for a co-parenting agreement or a sperm donation agreement. Desai explained the difference between these two arrangements, and told them that if they opted for a sperm donation agreement, she could not represent both parties and one of them would be required to obtain "separate legal representation." Desai testified that, according to her notes from the March 25 meeting (which were admitted into evidence at trial), she informed the parties that if she was going to represent both of them, "there has to be an understanding that [they are] co-parenting."

¶ 50        Desai advised the parties that the disposition of the embryos was "one of the points we need to decide" and that Jacob and Karla "need[ed] to think about what they want." She did not recall whether Karla indicated that the couple had an agreement to allow Karla to use the pre-embryos without Jacob's prior consent. She explained, however, that following their meeting, she "had concluded that for purposes of the draft [agreement] [she] would say that if they weren't together Karla would control their disposition."

¶ 51        Desai also testified that she did not see the Informed Consent during the meeting. She has, however, seen the "generic" medical consent forms used by Northwestern many times and believes that "part of the reason that Northwestern has these [co-parenting or sperm donor] agreements entered into is because the agreement would supersede the consent." In her opinion, the Informed Consent that Jacob and Karla signed was a vehicle for Northwestern to "protect themselves and say 'look we're not going to do anything unless we have some sort of direction from one of the parties.' " Desai acknowledged that she was not at Northwestern with the parties when they signed the Informed Consent, but her understanding of the document was "based on [her] conversations with their reproductive endocrinology department over the years."

¶ 52        Desai testified that Jacob and Karla did not "formally" enter into an agreement during the meeting. Instead, "[t]here was discussion as to what might happen," which led Desai to "prepare[ ] a draft so they could read through it to see if it accurately reflect[ed] their understanding." She recalled that during their meeting, Jacob expressed that he wanted to help Karla have children and that she would be able to use the pre-embryos upon their separation:

          "Q. And Jacob told you at the meeting that Karla should be able to use the pre-embryos if they split up?

          A. Yes.

          Q. And the parties said that if they split up they wanted Jacob to become a sperm donor, correct?

          A. Yes. After discussing all the possibilities, yes. That was the conclusion that I came to."

¶ 53        Subsequently, on March 29, Desai received an e-mail from Karla, indicating that the couple "decided that they're not going to go the sperm donor route *** [and were] going to go the co-parenting route." In preparing the draft Co-Parent Agreement, Desai included a provision stating as follows: "Should the Intended Parents separate, Karla will control the disposition of the pre-embryos." Desai testified that this language had been added to the draft

agreement "[b]ecause it was something that we had, you know, discussed." When asked whether Jacob agreed that Karla would have sole control of the pre-embryos upon their separation, Desai responded:

"I don't know if he used those words, but that was the direction I thought they were going in. Yes. And that's why I put it in this way. Sometimes I will say in the event the intended parents separate the embryo shall be thawed thereby destroying their viability or they shall be donated to medical science. So this is the direction I thought they were going in based on the meeting. But of course the agreement was not signed ***."

¶ 54    Later, Karla asked Desai for a sperm donor agreement. Desai advised Karla that she would require a waiver and that Jacob would require separate legal representation. She gave Karla the name of an attorney for Jacob. That attorney later told Desai that Jacob "wasn't going to be moving forward with the sperm donation agreement."

¶ 55                                Ashley Harris's Testimony

¶ 56    Ashley Harris testified that she and Jacob were in a dating relationship from September 2007 to December 2012, with "a separation period for maybe five months or so" from late 2009 until April or May of 2010. She had not been aware, during their separation, that Jacob "was with someone else," *i.e.*, Karla. A few weeks after re-kindling their relationship, Jacob told Ashley "[t]hat he donated his sperm" to help Karla create pre-embryos with her eggs. Ashley recalled that when she learned about the pre-embryos, she "wasn't happy about it." Although she "never specially asked," she "just assumed" that Karla would want to use the pre-embryos at some point. She gave Jacob an ultimatum:

"Immediately when I found out, I told him I didn't want to be with him if they had gone through with it. So I said that he would have to tell her if he wanted a relationship with me that she could not use [the pre-embryos]."

According to Ashley, that was when Jacob "realized that [neither Ashley] nor any woman would want to be with somebody who had embryos with someone else."

¶ 57    Ashley further testified that she and Jacob did not discuss much more about the pre-embryos "besides the fact that [Karla] couldn't use them and that he had to go through the motions of that if he wanted a relationship with me." She was aware that Jacob and Karla were still having some communications. On one occasion, Jacob showed her the June 14, 2010 e-mail that he sent to Karla, which stated in part the following:

"Karla, I've told Ashley about us. And in hearing so, she can't even bear the thought of what I did for you. While Ashley and I were separated while you and I were together, she still cared deeply for me. In talking with her, I found out that as a direct result of what has happened between you and I, she could never even consider being with me nor loving me if we were to go ahead and have a child either as donor or by co-parenting."

¶ 58    Ashley testified that she later discovered a draft sperm donor agreement when she accessed Jacob's e-mails. She also noticed an e-mail to Karla dated September 10, 2010, in which he wrote "Please mail any correspondence to the below address and don't reply to this message because other people routinely access my e-mail and will ultimately make this a harder decision for me to make." The address that Jacob listed was that of a male friend. Ashley later

"confronted [Jacob] about it and asked him why [he and Karla] had drafted something [she] didn't know about."

¶ 59    Ashley and Jacob ended their relationship in December 2012. According to Ashley, the decision to end their relationship had nothing to do with Jacob's lawsuit or the pre-embryos.

¶ 60                            The Circuit Court's Ruling

¶ 61    Following a two-day trial, on May 16, 2014, the circuit court entered a written order awarding Karla sole custody and control of the pre-embryos. First, the court found that the parties entered into an enforceable oral agreement on March 24, 2010 which "contains the offer and acceptance and meeting of the minds regarding the disposition of the embryos *** [and] represents the intent of the parties, at that time, that Karla need not obtain Jacob's consent to use the embryos to attempt to have a child." Second, it found that the March 25, 2010 Informed Consent "specifically contemplates that another agreement between the parties may govern the future disposition of the embryos" because "[t]he form states Northwestern will abide by any agreement reached between the parties." The court ruled that the parties' "previous oral agreement *** is not contradicted or modified by any language in the Informed Consent, or by anything else that happened between the parties."

¶ 62    Despite finding that the parties' interests and rights in the pre-embryos were controlled by their March 24 oral agreement, which allowed Karla to use the pre-embryos without Jacob's consent, the circuit court also considered the evidence under the balancing-of-interests analysis, presumably to provide a complete factual and legal framework for this court's benefit on review. The court held that Karla's interests in using the pre-embryos outweighed Jacob's interests in preventing their use. Specifically, the court found that "Karla's desire to have a biological child in the face of the impossibility of having one without using the embryos, outweighs Jacob's privacy concerns, which are now moot, and his speculative concern that he might not find love with a woman because he unhesitatingly agreed to help give Karla her last opportunity to fulfill her wish to have a biological child."

¶ 63    Jacob filed a notice of appeal. We have jurisdiction over this cause pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. May 30, 2008).

¶ 64                                   ANALYSIS

¶ 65    As previously noted, this case presents the question of who is entitled to determine the disposition of the pre-embryos that the parties created jointly with their sperm and eggs.[2] In *Szafranski I*, we held that the dispute should be settled, first, by honoring any advance agreement between the parties regarding the disposition of the pre-embryos. Alternatively, in the absence of such an agreement, the circuit court should resolve the issue weighing the parties' relative interests in using or not using the pre-embryos. *Szafranski I*, 2013 IL App (1st) 122975, ¶¶ 40, 42. On remand, the circuit court considered the evidence adduced at the trial and ultimately concluded that Karla was entitled to the sole control over the pre-embryos under both tests.

¶ 66                            March 24, 2010 Oral Agreement

---

[2]For consistency purposes, we adopt the parties' use of the term "pre-embryo" to describe a fertilized egg prior to implantation. *In re Marriage of Dahl*, 194 P.3d 834, 835 n.1 (Or. Ct. App. 2008).

¶ 67    An oral agreement is binding where there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement. *Bruzas v. Richardson*, 408 Ill. App. 3d 98, 105 (2011). To be enforceable, the material terms of a contract must also be definite and certain. *Id.* "The terms of a contract will be found to be definite and certain *** if a court is able to ascertain what the parties agreed to, using proper rules of construction and applicable principles of equity." *Id.* The parties' intent in forming an oral contract and the terms of the contract are questions of fact to be determined by the trier of fact. *Prignano v. Prignano*, 405 Ill. App. 3d 801, 810 (2010); *Hedlund & Hanley, LLC v. Board of Trustees of Community College District No. 508*, 376 Ill. App. 3d 200, 205 (2007).

¶ 68    The standard of review for resolving the parties' competing interpretations of their agreement of March 24 is highly deferential. "Ordinarily, the intent of the parties to an oral contract is a question to be determined by the trier of fact." *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 141 (1986). "A reviewing court must not set aside such a finding unless it is contrary to the manifest weight of the evidence." *Id.* See also *Edward M. Cohon & Associates, Ltd. v. First National Bank of Highland Park*, 249 Ill. App. 3d 929, 941 (1993) ("A trial court's construction of an oral agreement between the parties will be followed unless it is against the manifest weight of the evidence and an opposite conclusion is clearly warranted."); *Goldenberg v. Bazell*, 219 Ill. App. 3d 672, 679 (1991) (upholding the trial court's ruling that an oral contract existed where it was not against manifest weight of the evidence). A trial court's conclusion is against the manifest weight of the evidence when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). We will not substitute our judgment for that of the circuit court, and "[w]here several reasonable inferences are possible, those conclusions drawn by the trial court must prevail." *Rankin v. Hojka*, 42 Ill. App. 3d 440, 446 (1976).

¶ 69    At the outset, we emphasize that Jacob concedes that a contract was formed on March 24; as such, no dispute exists as to the existence of the parties' oral contract. The sole dispute stems from a disagreement over the scope of their agreement. Under the circumstances, we will not disturb the circuit court's finding that the parties entered into an oral contract on March 24 regarding the creation of pre-embryos with Jacob's sperm and Karla's eggs. We find nothing in the record to suggest that the circuit court erred in this finding.

¶ 70    As we turn to the scope of the parties' oral contract, we note that several facts are not in dispute. Significantly, Jacob does not challenge the finding that an oral contract was created on March 24 when Karla asked him if he would be willing to donate his sperm to create pre-embryos with her, and he manifested his acceptance of Karla's offer by responding "yes."[3] The parties both acknowledge that Jacob agreed to donate his sperm after Karla told him that she would likely become infertile after her chemotherapy treatment. Both parties further acknowledged, through trial testimony, that the purpose of the oral contract was for Jacob to provide his sperm to fertilize Karla's eggs so that she could preserve her ability to have a biologically related child of her own in the future, after her chemotherapy treatment ended.

_____

[3]In his opening brief, Jacob characterizes the March 24 understanding as an "oral contract" but later, in his reply brief, refers to it exclusively as an "oral agreement." We find no relevance in the different choice of words as both parties acknowledge that they entered into an oral contract on March 24, 2010.

Finally, it is undisputed that the parties knew that the pre-embryos would have to be cryopreserved for later use and that they would not be transferred to Karla for implantation, at the earliest, until after she finished her chemotherapy treatment.

¶ 71 Here, after the circuit court found that the parties formed an oral contract on March 24, it next had to resolve the question of whether the parties, when forming this contract, intended for Karla to use the pre-embryos to have a child–presumably at some later time after her medical treatment ended–without obtaining Jacob's consent. According to Jacob, he never agreed, on March 24, that Karla could use the pre-embryos without his consent. Conversely, Karla contends that their agreement did not include any limitation on her use of the pre-embryos and that the parties intended for Karla to use them, without condition, to have a biological child.

¶ 72 On remand, the circuit court was asked to determine whether the parties had any advance agreement regarding Karla's right to use the pre-embryos. Following its consideration of the trial evidence, the court concluded that Jacob had agreed to donate sperm specifically for the purpose of allowing Karla to later have a child of her own and that the parties intended for Karla to use any resulting pre-embryos without Jacob's consent. In reaching its decision, the court found the following evidence dispositive of the parties' intent at the time their contract was formed: (1) neither party expected to continue their relationship in the long run; (2) neither discussed or signed the Co-Parent Agreement and, thus, did not modify their March 24 oral contract; and (3) Jacob told Karla, in his June 14, 2010 e-mail, that he wanted Karla to have a child of her own and that he would leave it to her to decide whether to use the pre-embryos.

¶ 73 On appeal, Jacob contends that the circuit court erred in finding that the March 24 oral contract "contains the offer and acceptance and meeting of the minds [between Jacob and Karla] regarding the disposition of the embryos." He specifically takes issue with the court's finding that the agreement "represents the intent of the parties, at that time, that Karla need not obtain Jacob's consent to use the embryos to attempt to have a child." Jacob argues that, at the time the contract was formed, he agreed only to donate sperm for Karla's IVF procedure so that she could attempt to have a biologically related child later, no more and no less. He maintains that he and Karla "never even discussed or contemplated" the issue of how the pre-embryos would be used or disposed of following the IVF and cryopreservation. In sum, he argues that "[c]onsent to create pre-embryos is not consent to their possible use at some unknown time in the future."

¶ 74 We must determine whether the circuit court properly found that the parties intended, under the March 24 oral contract, to allow Karla to use the pre-embryos without such a limitation. Stated differently, was Karla's right to use the pre-embryos for implantation without Jacob's consent an additional "benefit" separate and independent from the parties' agreement to create pre-embryos and one which the parties had not bargained for or contemplated when they mutually agreed to create the pre-embryos in the first place? Our review of the evidence is deferential, and even if this court "might have reached a different conclusion had it been the fact finder," we will not disturb the trial court's judgment unless it is "unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995).

¶ 75 According to Jacob's own testimony, he never communicated a desire to have any say in Karla's future disposition of the pre-embryos; his only concern was to help her take the necessary steps to preserve her ability to create pre-embryos for that purpose. "The principal

objective in construing a contract is to ascertain and give effect to the intent of the parties." *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill. App. 3d 929, 941 (2004). Such " '[i]ntent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware." *Id*. "When a contract is ambiguous or silent on a disputed issue, a court may, in order to determine the intent of the parties at the time of contracting, consider the contemporaneous or subsequent acts of the parties to the contract." *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1021 (1989).

¶ 76    Jacob suggests that the parties could not have reached an agreement to allow Karla to use the pre-embryos without his consent because the issue never entered his mind at the time he agreed to donate his sperm to help Karla create the pre-embryos. Jacob also argues that because the March 24 contract is silent on the issue of whether Karla has an unlimited and unqualified right to use the pre-embryos, it cannot be construed to reflect the parties' mutual assent or intent to grant Karla such a right. Instead of conceding the possibility that the lack of such thought suggests that he never initially intended to limit Karla's use of the pre-embryos, Jacob instead asserts that the court should honor the parties' silence regarding any limitations. Specifically, he argues that the March 24 oral contract should be construed as an agreement confined solely to the donation of sperm and use of that sperm for the creation of pre-embryos. Under his proposed interpretation, the use of the couple's pre-embryos would be subject to *his* control and consent, even though it is clear that neither party expected him to use the pre-embryos at any time.

¶ 77    In response to Jacob's argument, Karla points out that he has ignored the "overwhelming" evidence that they "agreed, understood and intended that the *very purpose* of their agreement was to provide Karla with the ability *to have her own biological child* in the future with the return of her health." (Emphases in original.) Karla argues that Jacob now seeks to add a term to their oral contract that was not previously included or bargained for: namely, a right to withhold consent for transfer of the pre-embryos that would prevent Karla from using them to have a child.

¶ 78    The record reveals several instances where Jacob could have voiced his alleged desire about wanting a right to consent to Karla's use of the pre-embryos and, nevertheless, remained silent on the issue. The first instance was on March 24, the day he agreed to donate his sperm. Jacob testified that he did not inform Karla that his agreement to create pre-embryos was contingent on a right to withhold consent to her subsequent use of the pre-embryos. On March 25, the very next day, Jacob told Dr. Klock that he wanted to help Karla have a child, but again failed to mention any reservation about her use of any resulting pre-embryos. Desai also recalled Jacob telling her he wanted Karla to use the pre-embryos to have a child and that she could use them in the event of their separation. On April 6, when Karla asked Jacob if she should fertilize all eight of her eggs, he agreed that she should, as opposed to reserving and cryopreserving some of the eggs–likely her last "fertile" ones–for insemination at some future date. Finally, even in the midst of their dispute over the pre-embryos, Jacob indicated, in his June 14 e-mail to Karla, that his consent to her use was unconditional:

> "When you asked me if I would be the donor for your emergent egg harvesting, I still have no reservations in my answer. If you desired to have the possibility of having a child in the future and I could be of help to you, I'd do it all over again."

¶ 79        Jacob's contention also presupposes that Karla understood, on March 24, that he could have validly "withheld" consent or asserted a veto over her use of the pre-embryos under any circumstance that had not been expressly agreed upon by the parties. The circuit court rejected this assertion following its consideration of the evidence in the record, and we find no reason to disturb its findings. Under Jacob's reasoning, any unexpressed contingency related to the storage or use of the cryopreserved pre-embryos would be subject to Jacob's prior consent simply because he and Karla did not discuss it when they decided to undergo IVF. For example, he could challenge Karla's right to use the pre-embryos because they never agreed to a duration term (*e.g.*, an expiration period for use of the pre-embryos), a marital status condition (*e.g.*, so long as neither of them was engaged or married at the time Karla sought to transfer the pre-embryos), or a transferee limitation (*e.g.*, if Karla required the transfer of the pre-embryos to a gestational surrogate instead of to herself). This proposition would allow Jacob to limit Karla's use of the pre-embryos each time a previously unidentified circumstance or contingency arose, essentially undermining the irrefutable purpose of the IVF and pre-embryo creation.

¶ 80        Because "great weight should be given to the principal apparent purpose and intention of the parties at the time of contracting" (*Vole, Inc.*, 181 Ill. App. 3d at 1020), we see no error in the circuit court's finding that the parties intended to allow Karla to use the pre-embryos without limitation when they formed the March 24 contract. After considering the testimony and evidence presented at trial, the circuit court concluded that the parties understood that the purpose of creating the pre-embryos was to preserve Karla's ostensibly last opportunity to have a biological child in the future, without conditions. "It is well settled that it is within the province of a trial court to determine the credibility of witnesses, the weight to be accorded their testimony, and to resolve inconsistencies and conflicts." *Goldenberg*, 219 Ill. App. 3d at 678. Here, the circuit court had the opportunity to weigh the evidence and assess the credibility of the witnesses at trial, and to resolve any inconsistencies and conflicts in the record. "Where the testimony of a witness is neither contradicted, either by positive testimony or by circumstances, nor inherently improbable, and the witness has not been impeached, that testimony cannot be disregarded by the trier of fact." *Bazydlo*, 164 Ill. 2d at 215.

¶ 81        We further find that the relief Jacob seeks–essentially, incorporating a limitation into the oral contract–would change the fundamental essence of the parties' oral contract. "[A] court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included." *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301 (2006), *aff'd*, 226 Ill. 2d 208 (2007) (citing 12A Ill. L. and Prac. *Contracts* § 233 (1983)). Jacob is seeking the addition of a new term that neither party agreed to.

¶ 82        At trial, both Jacob and Karla testified that they never discussed whether Jacob's consent would be needed to use the pre-embryos; Jacob himself admitted that the thought of placing limitations on Karla's use of the pre-embryos "never crossed [his] mind." A trier of fact could reasonably infer from this evidence–Jacob's failure to express *any* reservation as to the creation or use of the pre-embryos–that he never intended to limit Karla's use of the pre-embryos.

¶ 83        "A presumption exists against provisions that easily could have been included in the contract but were not." *Id.* Had Jacob wanted to preserve his ability to later veto Karla's use of

the pre-embryos, the time for expressing that condition was when he accepted Karla's offer. All he would have been required to say is: yes, he would donate his sperm, but that he wanted Karla to seek his consent before attempting to use any resulting pre-embryos to have a child. Jacob, however, remained silent on this issue, did not express any reservations to creating the pre-embryos, and told Karla that he wanted to help *her* have a child. Jacob had several additional opportunities to express his intent to impose a limitation, *i.e.*, his veto authority, over Karla's use of the pre-embryos, but kept silent that purported intention. Instead, he continually asserted only an interest in helping Karla become a mother to genetic offspring. All of this suggests, as the circuit court found, that the parties never intended to limit Karla's ability to use the pre-embryos to have a child. Under the circumstances, we find it contrary to the evidence that Karla would have given Jacob an arbitrary veto power over her dream of having a biological child.

¶ 84    Lastly, Jacob takes issue with the court's consideration of evidence that he asserts was "irrelevant" to the determination of whether the parties contemplated that Jacob's consent was required for use of the pre-embryos. Specifically, he argues that it is irrelevant that: (i) he and Karla did not plan on being together in the future; (ii) he never told Karla his consent was required to use the pre-embryos; and (iii) he "supposedly" left it up to Karla to decide what to do with the pre-embryos in his email dated June 14, 2010 ("I know that I must make a choice in this and choose to leave it up to you ultimately to decide Karla.").

¶ 85    It is not apparent from Jacob's argument whether he is challenging the admissibility of the evidence or merely asserting that it offered no probative value at trial. Any challenge to the admissibility of the evidence has been forfeited because he made no objections to the evidence at trial. See *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 71 (Failure to raise or renew an objection during the trial "results in forfeiture of the ability to challenge the trial court's consideration of that evidence."). Furthermore, "[e]videntiary rulings are within the sound discretion of the trial court and will not be reserved absent an abuse of that discretion." *Williams v. BNSF Ry. Co.*, 2015 IL App (1st) 121901, ¶ 43 (citing *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)). Reversal of an evidentiary ruling is only appropriate if the ruling was "fanciful, arbitrary, or unreasonable, or where no reasonable person would take the same view." *Id.* Here, we find no error or abuse of discretion. Alternatively, if Jacob is asserting that the court should not have considered the evidence because it offered no probative value, this argument lacks merit. The trial judge is in "the best position to evaluate the relevance of the evidence" (*Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 176 (1995)), and can properly discern the parties' intent in an oral agreement from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation. *Anastaplo v. Radford*, 14 Ill. 2d 526, 537 (1958).

¶ 86    The circuit court's judgment will not be vacated unless it is unreasonable, arbitrary, or not based on evidence. *Eychaner*, 202 Ill. 2d at 252. Because the circuit court's judgment was not against the manifest weight of the evidence, we conclude that the court properly ruled that Karla is entitled to use the pre-embryos to have a child, without limitation.

¶ 87                              March 25, 2010 Informed Consent

¶ 88    The next issue is the legal effect of the Informed Consent that the parties signed on March 25. The Informed Consent states, in relevant part: "Embryos are understood to be your property, with rights of survivorship. No use can be made of these embryos without the consent

of both partners (if applicable)." The parties each impart a different meaning to the language of this provision.

¶ 89    The circuit court found that this provision did not contradict or modify the terms of the March 24 oral contract between the parties. Specifically, it stated as follows:

"Where two parties are involved, the form states that both must consent to the use of the embryos. The form, however, specifically contemplates that another agreement between the parties may govern the future disposition of the embryos. A provision encourages the parties to seek an attorney to advise them on concerns about the future status or disposition of the embryos. The form states Northwestern will abide by any agreement reached between the parties. In this case, Karla and Jacob have a previous oral agreement which is not contradicted or modified by any language in the Informed Consent, or by anything else that happened between the parties.

Accordingly, this Court finds that the consent language in Northwestern's Informed Consent does not apply to Karla and Jacob under the facts in this case, and the March 24, 2010 oral agreement stands uncontradicted."

¶ 90    Jacob contends that the circuit court erred in finding that this provision did not contradict or modify the parties' oral contract of March 24. According to him, the Informed Consent represents a binding written agreement that limits his and Karla's rights to use the pre-embryos. He argues that by signing the Informed Consent on March 25, he, Karla, and Northwestern agreed that any use of the pre-embryos is subject to both Jacob's and Karla's prior consent.

¶ 91    Karla argues that she never agreed to limit her right to use the pre-embryos when she signed the Informed Consent on March 25. She further argues that the Informed Consent is not a "dispositional" agreement because it does not provide for a specific disposition of the pre-embryos in the event of the parties' separation. She points out that the informed consents that have been considered by other jurisdictions in disputed embryo lawsuits are distinguishable from this one because they involved dispositional agreements that "specifically contemplate the circumstances in which the parties find themselves."

¶ 92    Initially, we must address Karla's argument that Jacob is barred from seeking relief under the Informed Consent because he failed to plead an action to enforce it in his complaint and, in fact, expressly disavowed a contractual relationship between the parties. In his complaint, Jacob alleged that the parties "consented individually to a battery of medical tests in the process of the creation of said Pre-Embryos, *free of any contractual agreement concerning the future use, custodial ownership and or final disposition of said Pre-Embryos*." (Emphasis added.) In her pretrial memorandum, Karla mentioned Jacob's failure to bring a claim for enforcement of the Informed Consent. However, she never filed a motion objecting to his pleading at any time before, during or after the trial. 735 ILCS 5/2-615(a) (West 2012) (noting that "[a]ll objections to pleadings shall be raised by motion"); see also 735 ILCS 5/2-612(c) (West 2012) ("[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived"). Under the circumstances, she has forfeited her objection to Jacob's failure to state a claim based on the Informed Consent. See 735 ILCS 5/2-615(a) (West 2012).

¶ 93    Turning to the merits of the dispute, we must consider two separate issues: (1) whether the Informed Consent constitutes an "advance agreement" under *Szafranski I*; and (2) whether its terms contradicted or modified the dispositional agreement reached by the parties on March 24.

¶ 94    While the circuit court did not directly reach the issue of whether the Informed Consent constituted an advance agreement as to disposition of pre-embryos under *Szafranski I*, it did find that "the consent language in Northwestern's Informed Consent does not apply to Karla and Jacob under the facts in this case." In doing so, the court found that the Informed Consent also required Northwestern to "abide by any agreement reached between the parties" and that Karla and Jacob had reached an agreement on March 24 that did not conflict with the Informed Consent. Accordingly, under the terms of the Informed Consent, any use of the pre-embryos would be governed by the parties' March 24 contract. This conclusion is supported by the evidence. It is undisputed that Jacob and Karla entered into an enforceable contract on March 24, the day before they signed the Informed Consent. It is also undisputed that neither of the parties contemplated a limitation on Karla's use of the pre-embryos at any time prior to their separation. Absent evidence of any other agreement between the parties, the March 24 contract is controlling.

¶ 95    We further agree with the circuit court that the terms of the Informed Consent in this case neither modified nor contradicted the parties' oral agreement of March 24. The construction of a contract presents a question of law, which we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). "In order to construe the legal nature of the writing, it is necessary to consider it in the light of the circumstances under which it was created." *Whitelaw v. Brady*, 3 Ill. 2d 583, 586 (1954). "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher*, 226 Ill. 2d at 232. A contract must be construed as a whole, viewing each part in light of the others. *Id.* at 233. "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* See also *A. Epstein & Sons International, Inc. v. Eppstein Uhen Architects, Inc.*, 408 Ill. App. 3d 714, 720 (2011) ("An instrument's legal effect is not 'to be determined by the label which it bears or the technical terms it contains.' [Citation.] Rather, it is the intention of the parties that governs." (quoting *Bonde v. Weber*, 6 Ill. 2d 365, 377 (1955))).

¶ 96    The Informed Consent in this case contemplated the parties reaching a separate agreement as to disposition and did not contain any language that would override the parties' prior agreement. The Informed Consent simply provided that Northwestern would refrain from taking any action with the pre-embryos unless the parties both consented to such action. Significantly, the provision requiring both parties to consent to use of the pre-embryos does not bar a situation in which the parties have reached an advance agreement–oral or written–concerning disposition. The Informed Consent merely advised the parties that Northwestern had no legal right to use or dispose of the pre-embryos in any manner that either Jacob or Karla would find objectionable. In other words, Northwestern was legally prohibited from doing anything with the pre-embryos (so long as the cryopreservation fee was paid every year) unless there was evidence of consent to such action from both Jacob and Karla. The circuit court concluded that the parties mutually consented to a disposition by the latter: the court found that the parties entered into an enforceable oral contract whereby Jacob would donate sperm for Karla to create a pre-embryo so that Karla, at her sole discretion and without limitation, could use the pre-embryos to become the mother of a child who shared her DNA.

¶ 97    Our opinion in *Szafranski I* emphasized the importance of honoring advance agreements between IVF participants. Central to our holding in that case was the idea that advance agreements allow parties to settle their rights and obligations *before* an issue over rights or obligations arise. Here, the parties have reached a binding oral contract concerning the use of

- 19 -

pre-embryos that, unless modified or contradicted, remained in full force and effect. See *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004) (noting that a "modified contract is regarded as creating a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed"). We find no language in the Informed Consent that would override Jacob and Karla's prior oral contract wherein the parties consented to Karla using the pre-embryos at her discretion to have a biological child. Therefore, in accordance with *Szafranski I*, we hold that the March 24 oral agreement is controlling as to disposition.

¶ 98    We disagree with Jacob's argument that the language of the Informed Consent, and specifically the consent provision, sets forth the parties' intended disposition in the case of their separation and thus modifies their prior agreement. When viewed in the context of the entire Informed Consent, it is clear that the consent provision merely sets forth Northwestern's policy as to its patients. The Informed Consent initially advises patients that "it is important *** for *you* to decide what should be done with any of your cryopreserved embryos" in the event of separation. (Emphasis added.) It then contains the following *form language*: "Embryos are understood to be your property, with rights of survivorship. No use can be made of these embryos without the consent of both partners (if applicable)." Immediately thereafter, the Informed Consent identifies three events that would require a decision as to disposition: (1) divorce or dissolution of the marriage or partnership; (2) death or legal incapacitation of one partner; and (3) death or legal incapacitation of both partners. With respect to those situations, the Informed Consent provides what will happen to the pre-embryos. In the first situation, Northwestern will abide by the terms of a court decree or settlement agreement. In the second situation, the other partner becomes the sole decision-maker regarding the pre-embryos. Finally, in the third situation, the pre-embryos become the property of Northwestern. Significantly, the Informed Consent does not state what will happen to pre-embryos in the event an unmarried couple separates.

¶ 99    Jacob urges this court to construe the consent provision as an expression of the parties' intent that neither of them could use the pre-embryos without the other's consent in the event of separation. Under his proposed reading, the preprinted boilerplate inserted by Northwestern into the consent provision would govern the disposition of the pre-embryos such that Jacob could withhold his consent to Karla's use at any time. This interpretation would run directly contrary to the language giving Jacob and Karla–not Northwestern–the right to decide the fate of their pre-embryos. Contrary to Jacob's argument, the lack of any dispositional option in this provision is not evidence of an advance agreement to "reserve" his consent to the future use of the pre-embryos. Instead, it is evidence of the *absence* of any agreement in the Informed Consent regarding disposition upon the couple's separation.

¶ 100   Jacob's proposed reading of the consent provision also fails to consider that Northwestern has not specified what will happen in the event an unmarried couple separates. Northwestern specifically addressed how the couple's pre-embryos will be disposed of in three different situations–divorce, death of one partner, and death of both partners–but, significantly, it did not address how their pre-embryos would be treated in the event that they separated. This can mean only one thing: that neither the couple nor Northwestern, in executing the Informed Consent, considered what would happen to the pre-embryos in that event. There is no doubt that Northwestern was aware of the possibility that an unmarried couple might separate; it expressly stated in the Informed Consent that it was important for the couple to decide what

- 20 -

would happen in that situation. It nonetheless remained silent as to what would happen to the couple's pre-embryos if they separated, choosing instead to address what would happen in other specific situations. Under the circumstances, we can only interpret this as a purposeful omission.

¶ 101    Finally, Jacob's interpretation of the consent provision is inconsistent with the language of the consent provision itself. The consent provision begins with a statement written in the passive voice: "Embryos are understood to be your property, with rights of survivorship." From the start, it is clear that the provision is phrased to state Northwestern's policy with respect to its patients; that is, Northwestern understands that the embryos are "your," *i.e.*, Jacob and Karla's, property. The consent provision serves as a mandate, not an option for election: "No use can be made of these embryos without the consent of both partners (if applicable)." If this provision was intended to be an expression of the parties' dispositional intent, it would contain language more reflective of a choice (for example, in the event of our separation, "we" elect that neither party can use the pre-embryos without the other party's express consent). In another provision of the Informed Consent the couple may elect a dispositional option from three choices in the event they both die or become legally incapacitated. There, the provision states, "I/we elect to: (please select and initial your choice)," and sets forth three dispositional options: thawing and discarding the embryos, donating the embryos for research, or donating the embryos to another couple. The disputed provision contains no such elective language or dispositional options. Given the language and context in which it appears, it cannot be fairly read as representative of the parties' specific intent concerning disposition of the pre-embryos in the event of separation.

¶ 102    We do not believe that the Informed Consent is ambiguous on the question of disposition in the event of the parties' separation–there is no set disposition. However, even assuming *arguendo* that the document is ambiguous, we find that the extrinsic evidence also supports our interpretation that the parties never intended to be bound to a particular disposition in signing the document. See *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 450-51 (2007) (court found language in an employment agreement unambiguous, but noted that even if the language was ambiguous, parol evidence supported its interpretation). When the language of a contract is susceptible to more than one meaning, and thus ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Gallagher*, 226 Ill. 2d at 233. The intended meaning of ambiguous contract language may be derived from the circumstances surrounding the formation of a contract or from the conduct of the parties subsequent to its formation. *Village of Northbrook v. Village of Glenview*, 88 Ill. App. 3d 288, 293 (1980).

¶ 103    Here, the evidence suggested that the parties were told that they would both need to consent to any use of the pre-embryos because they were not married. Jacob, however, agreed that Dr. Kazer did not ask Karla or him what should happen to the pre-embryos in the event of their separation. He, in fact, agreed that Dr. Kazer encouraged them to consult with an attorney to resolve that particular issue. Dr. Kazer also confirmed that the Informed Consent does not necessarily document the parties' wishes with respect to disposition of the pre-embryos. He testified that it is "more appropriate" for a couple "to get legal counsel to document their specific desires about disposition, and *in particular, if they ultimately split up*." (Emphasis added.) Ultimately, neither the plain language of the Informed Consent nor the related extrinsic

evidence suggests that the parties agreed upon a particular disposition in the event of their separation.

¶ 104    To rule in Jacob's favor, this court would have to find that the March 25 Informed Consent constituted (1) a modification of the March 24 oral contract, or (2) evidence that Jacob never relinquished an implied right to veto Karla's use of the pre-embryos when he entered the oral contract. As discussed, these propositions are defeated by the language used in the Informed Consent and the evidence presented at trial showing that any limitation on Karla's use of the pre-embryos "never crossed [his] mind." We therefore agree with the circuit court that the Informed Consent neither contradicted nor modified the parties' March 24 oral contract.

¶ 105    We acknowledge that, in a number of cases from other jurisdictions, courts have found a couple's dispositional intent to have been expressed in an IVF-related agreement: *Kass v. Kass*, 696 N.E.2d 174 (N.Y. 1998); *In re Marriage of Dahl*, 194 P.3d 834 (Or. Ct. App. 2008); *Davis v. Davis*, 842 S.W.2d 588, 604 (Tenn. 1992); *Roman v. Roman*, 193 S.W.3d 40 (Tex. App. 2006); *In re Marriage of Litowitz*, 48 P.3d 261 (Wash. 2002). We note that, while it is not the case here, a medical informed consent could, under particular circumstances, represent an "advance agreement" that reflects a couple's intended disposition of the pre-embryos. See *Szafranski I*, 2013 IL App (1st) 122975, ¶ 40. As discussed below, however, we find these cases distinguishable.

¶ 106    In *Kass*, a case decided by the Court of Appeals of New York, a husband and wife who underwent IVF procedures signed four consent forms, one of which contained a section entitled " 'Disposition of Pre-Zygotes.' " *Kass*, 696 N.E.2d at 176. This section provided in pertinent part: " 'Our frozen pre-zygotes will not be released from storage for any purpose without the written consent of *both* of us ***. In the event of divorce, we understand that legal ownership of any stored pre-zygotes must be determined in a property settlement and will be released as directed by order of a court of competent jurisdiction.' " (Emphasis in original.) *Id.* The consent form allowed the couple to choose a preprinted option for disposition, and included a provision requiring the parties to specify its desired disposition " '[i]n the event that [they] no longer wish to initiate a pregnancy or are unable to make a decision regarding the disposition of our stored, frozen pre-zygotes.' " *Id.* The parties initialed the preprinted option to allow the " 'frozen pre-zygotes [to] be examined by the IVF Program for biological studies and be disposed of by the IVF Program for approved research investigation as determined by the IVF Program.' " *Id.* at 177.

¶ 107    Later, during divorce proceedings, the wife sought sole custody of the pre-zygotes so she could use them for implantation. *Id.* The husband objected and asked the court to enforce the informed consent according to its terms, *i.e.*, to donate the frozen pre-zygotes for IVF research. *Id.* The trial court awarded the wife custody of the pre-zygotes, but the appellate court later reversed, a plurality finding that the informed consent should control because it represented the couple's agreement regarding disposition under the circumstances. *Id.* The Court of Appeals of New York upheld the appellate court's ruling, finding that the parties had indicated their dispositional intent in their signed consents. *Id.* at 180. The court noted that "neither party disputes that [the consents] are an expression of their own intent regarding disposition of their pre-zygotes" and that neither "contest[ed] the legality of those agreements, or that they were freely and knowingly made." *Id.* Notably, the court also observed:

> "The conclusion that emerges most strikingly from reviewing these consents as a
> whole is that appellant and respondent intended that disposition of the pre-zygotes was

to be their joint decision. *** Words of shared understanding–'we,' 'us' and 'our'–permeate the pages." *Id.* at 181.

¶ 108    The facts here are distinguishable. Unlike the informed consents that were at issue in *Kass*, the Informed Consent in this case provided no opportunity for Karla and Jacob to specify their choice on the disposition of the frozen pre-embryos in the event of their separation. Also, unlike the parties in *Kass*, Karla and Jacob dispute the legal effect of the Informed Consent and the impact, if any, that it had on their March 24 oral contract. We find *Kass* to be inapplicable.

¶ 109    In *Marriage of Dahl*, a case decided by the Court of Appeals of Oregon, a husband and wife reached an agreement on all matters in their marital dissolution action except for the disposition of six frozen pre-embryos created with the husband's sperm and the wife's eggs. *Marriage of Dahl*, 194 P.3d at 836. When undergoing IVF, the parties had signed an "Embryology Laboratory Specimen Storage Agreement" that set forth the terms for the storage of their pre-embryos. *Id.* The agreement allowed the couple to make their own choice regarding disposition, and provided that if the parties could not agree on a disposition, they would " 'designate the following [spouse] or other representative to have the sole and exclusive right to authorize and direct [the clinic] to transfer or dispose of the Embryos.' " Below this paragraph was a space provided which contained the wife's printed name and the initials of her and her husband, indicating their approval of the disposition provision. *Id.*

¶ 110    During the dissolution proceedings, the wife opposed donating the pre-embryos to another woman; the husband, on the other hand, wanted the pre-embryos donated to someone who was trying to conceive. *Id.* at 837. The trial court found that the terms of the storage agreement should control. *Id.* On appeal, the Court of Appeals of Oregon agreed that the storage agreement "evinced the parties' intent" that the wife would decide the disposition of the pre-embryos in the event the parties could not agree on a disposition. *Id.* at 841. The court pointed out the fact that "the parties [had been] given choices when they entered the agreement on possible disposition of the embryos." *Id.*

¶ 111    *Marriage of Dahl* ultimately bears more resemblance to *Kass* than to this case. The agreement in *Marriage of Dahl*, similar to the agreement in *Kass*, allowed the parties to affirmatively designate their dispositional intent in the event that there was a disagreement as to disposition. As we noted above in the context of our discussion of *Kass*, the Informed Consent in this case contains absolutely no place where the parties could have indicated a disposition in the event of their separation. This is important because Northwestern expressly states in the Informed Consent that it is *the parties* who should decide what is to happen to the pre-embryos in the event of their separation. We do not find *Marriage of Dahl* analogous to this case.

¶ 112    In *Roman*, a case before the Court of Appeals of Texas, a husband and wife, in the process of divorce, reached an agreement on the distribution of their marital property, except for who would get frozen embryos created with the husband's sperm and the wife's eggs. *Roman*, 193 S.W.3d at 43. The couple had executed a document prior to IVF entitled " 'Informed Consent for Cryopreservation of Embryos' " wherein they "*chose* to discard the embryos in case of divorce." (Emphasis added.) *Id.* at 42. A provision of the informed consent "allowed the parties to withdraw their consent to the disposition of the embryos." *Id.* On appeal, however, the parties did not dispute that they did not withdraw their consent to the disposition when they filed for divorce. *Id.* at 52.

¶ 113    At trial, the husband sought to enforce the informed consent, specifically the term that provided for disposal of the frozen pre-embryos in the case of divorce. *Id.* at 43. The wife, on the other hand, wanted the pre-embryos implanted so that she could have a biological child. *Id.* A doctor involved in the couple's IVF procedure testified during the proceedings that "the purpose of the cryopreservation form was to determine the parties' desires for the disposition of their embryos upon certain events such as divorce or death." *Id.* at 53. The trial court awarded the remaining three frozen pre-embryos to the wife as part of a "just and right" division of community property. *Id.* at 43. The Court of Appeals reversed, holding that the lower court should have enforced the informed consent provision requiring the frozen embryos to be discarded in the event of the parties' divorce. *Id.* at 54-55.

¶ 114    *Roman*, like the prior cases, is distinguishable in that the informed consent there allowed the *parties* to specify a disposition in the event of divorce. Furthermore, unlike here, the physician testified that the purpose of the informed consent was to establish the parties' dispositional intent in the event of divorce. Here, Dr. Kazer testified that the Informed Consent did not necessarily document the parties' wishes with respect to disposition of the pre-embryos and that it is "more appropriate" for a couple to have an attorney document their dispositional intent in the event that they split up. We find *Roman* distinguishable.

¶ 115    The final case where a court has found a couple's dispositional intent to have been expressed in an IVF-related agreement is *Litowitz*, a case decided by the Supreme Court of Washington. In *Litowitz*, a husband and wife disputed the proper disposition of pre-embryos created with the husband's sperm and a third-party donor's eggs. *Litowitz*, 48 P.3d at 262, 264. During dissolution proceedings, the husband indicated that he wanted the frozen pre-embryos put up for adoption; the wife, however, wanted to implant the pre-embryos in a surrogate and bring them to term. *Id.* at 264. At the time of IVF, the couple entered into a contract with the IVF facility, entitled "consent and authorization for preembryo cryopreservation," which provided in part "that any decision regarding the disposition of [the couple's] pre-embryos will be made by mutual consent. In the event [the couple is] unable to reach a mutual decision regarding the disposition of our pre-embryos, [the couple] must petition to a Court of competent jurisdiction for instructions concerning the appropriate disposition of [the couple's] pre-embryos." *Id.* at 263. The parties chose to have their pre-embryos thawed and not allowed to undergo further development in the event the pre-embryos had been cryopreserved for over five years. *Id.* at 263-64. They agreed that their choice would be " 'binding upon [them] until such time as it [was] changed, in writing, by [their] joint direction.' " *Id.* at 264.

¶ 116    The trial court awarded the pre-embryos to the husband based on the " 'best interest of the child.' " *Id.* The Court of Appeals affirmed, finding that the contracts signed by the couple "did not require [the husband] to continue with their family plan to have another child and that [the husband's] right not to procreate compelled the court to award the preembryos to him." *Id.* at 265. The Supreme Court of Washington ultimately concluded that it was "appropriate for the courts to determine disposition of the preembryos under the cryopreservation contract" given that the parties had "not reached a mutual decision regarding disposition." *Id.* at 268. The court then turned to the cryopreservation contract and noted that more than five years had passed since the cryopreservation contract was signed by the parties. *Id.* at 268-69. The court held that if the remaining pre-embryos still existed, "they would be a proper subject for consideration by the court under the cryopreservation contract"; however, if the pre-embryos had been

- 24 -

destroyed, the issue would now be moot. *Id.* at 269. The court could not "reach that determination" in light of the limited record before it. *Id.* at 270.

¶ 117　　We find the instant case distinguishable from the foregoing cases that we referenced in *Szafranski I*, all of which involved the court's enforcement of a specific, *chosen* disposition. *Litowitz* and the foregoing cases share one salient feature: they all involve married couples who signed forms allowing *them* to determine the disposition of their pre-embryos. Each of those cases are similar in that they all involved explicit language regarding the intended disposition of the pre-embryos in the event of a specific event. In other words, the consent forms in those decisions allowed the facilities to execute the pre-selected dispositional option without further consultation with the disputing parties.

¶ 118　　Jacob would have us interpret the boilerplate language used by Northwestern as an expression of the parties' dispositional intent. It cannot be disputed, however, that the Informed Consent lacks any direction or expression of a "choice" concerning disposition of the pre-embryos in the event of the parties' separation. Rather than informing Northwestern of the parties' election of either donation, disposal, or transfer upon the couple's separation, the Informed Consent simply prevents Northwestern from disposing of the pre-embryos in *any* manner without the parties' consent. The March 24 agreement is evidence of that consent.

¶ 119　　Because we agree with the circuit court's finding that the Informed Consent neither contradicts nor modifies the March 24 oral agreement, we find no basis to reverse the circuit court's ruling that Karla is entitled to control and custody of the pre-embryos.

¶ 120　　　　　　　　　　March 29, 2010 Draft Co-Parent Agreement

¶ 121　　For purposes of preserving her arguments on appeal, Karla contends that the circuit court erred in failing to enforce the Co-Parent Agreement that Desai drafted for the parties on March 29, specifically, the provision granting Karla full custody and control of the pre-embryos. Jacob argues that the Co-Parent Agreement is unenforceable because he and Karla never discussed the draft document and neither party signed it. He further argues that the agreement is unenforceable under the statute of frauds since it cannot be performed within one year.

¶ 122　　Because we find that the March 24 oral contract sets forth the parties' agreed upon disposition that Karla had the right to use the pre-embryos without Jacob's consent and that the Informed Consent did not contradict or modify this right, we need not determine the enforceability of the Co-Parent Agreement.

¶ 123　　　　　　　　　　　　　Balancing of the Interests

¶ 124　　In *Szafranski I*, we held that if the parties did not have an advance agreement concerning the disposition of the pre-embryos, the circuit court must then weigh the parties' relative interests with respect to the pre-embryos. In reaching its judgment, the circuit court decided that while it did not need to address the parties' arguments under a balancing-of-the-interests approach, it would do so for the benefit of providing a complete record on appeal. The circuit court considered the evidence at trial and found that "Karla's desire to have a biological child, in the face of the impossibility of having one without using the embryos, outweighs Jacob's privacy concerns, which are now moot, and his speculative concern that he might not find love." We agree with the circuit court's conclusion that Karla is entitled to control of the pre-embryos under this test.

¶ 125    Although Jacob requests that we review the circuit court's ruling on that issue under a *de novo* standard of review, we decline to do so. Questions of law are reviewed *de novo* while factual issues are reviewed under a manifest weight of the evidence standard. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 542 (2007). Here, the evidence considered by the circuit court in balancing the parties' interests was entirely factual in nature; the court conducted a fact-intensive inquiry into each party's interest in using or preventing the use of the pre-embryos. Therefore, we will reverse only if the judgment is against the manifest weight of the evidence. *Goldenberg*, 219 Ill. App. 3d at 679.

¶ 126    In reviewing the interests of the parties, we observe that many of Jacob's cited concerns were risks that both parties faced and knowingly accepted in agreeing to undergo IVF. Jacob testified that he does not want Karla to use the pre-embryos primarily because of the impact it would have on his other relationships. He testified that he has lost a love interest–undoubtedly referring to Ashley–because of the situation with Karla; that "a lot of people" think of him differently now; and that he is worried that no one will want to have a relationship with him knowing that he has fathered a child with Karla through IVF. Jacob feels as if he is being forced to have a child; he testified that he does not "want to be a father like this" and contends that he should not be forced to procreate with a woman whom he does not love.

¶ 127    Karla, on the other hand, cannot have a biological child without using the pre-embryos. She suffered ovarian failure as a result of her chemotherapy treatment and cannot have a biological child without using the pre-embryos. Karla testified that she was "devastated" upon learning that she would lose her fertility and thought about how she wants to have a child "with part of" her father, who passed away when she was five years old. She maintains that she does not expect Jacob to support any child born from the pre-embryos. Before and throughout the IVF process, Karla relied on Jacob's willingness to help her have a child. Following the retrieval, she relied on Jacob's assent to fertilize all of her remaining eggs with his sperm, thereby foregoing the possibility of using an anonymous sperm donor.

¶ 128    Having considered the testimony presented and the evidence under seal, we cannot say the circuit court's ruling, that Karla's interest in using the pre-embryos outweighs any interest Jacob has in preventing their use, was against the manifest weight of the evidence. At the heart of the evidence is an irrefutable fact: the sole purpose for using Jacob's sperm to fertilize Karla's last viable eggs was to preserve her ability to have a biological child in the future at some point after her chemotherapy treatment ended. The parties both recognized this when they agreed to create the pre-embryos together.

¶ 129    We concur in the circuit court's ruling that Karla's interest in using the pre-embryos is paramount given her inability to have a biological child by any other means. See *Reber v. Reiss*, 42 A.3d 1131, 1142 (Pa. Super. Ct. 2012) (balancing of the interests favored wife where the pre-embryos were her only opportunity to have a biological child); see also *Davis v. Davis*, 842 S.W.2d 588, 604 (Tenn. 1992) (noting that the balance of interests would be more likely to favor wife "if she could not achieve parenthood by any other reasonable means"). Although Karla has other options for becoming a parent, there is no evidence that she could have a biological child other than by using the pre-embryos. We decline to make a judicial determination that alternative methods of parenthood offer Karla an acceptable substitute to biological parenthood.

¶ 130    We also find no reason to disturb the circuit court's determination that Jacob's concern about not finding love in the future is "speculative." Moreover, his privacy concern is largely

moot now as a result of the very public nature of this case. The record lacks evidence from which a trier of fact may reasonably infer that Jacob's act–agreeing to help a friend threatened with infertility save her last chance to have a biological child–would be considered irreconcilable or repugnant by all future romantic prospects. It seems that Jacob's regrets about his role in creating the pre-embryos developed roots at the same time that some of his friends and family members voiced their disapproval. This was evident from Jacob's and Ashley's testimony, which revealed the strain on their relationship that resulted from Karla's desire to use the pre-embryos. In his effort to save this relationship, he had to conceal his subsequent attempts to resolve the dispute. We do not discount this evidence in any way. However, without diminishing Jacob's valid concern that some may hold him in a negative light for agreeing to donate his sperm to a woman he never intended to marry and with whom he had no future, we will not give weight to the judgments of those who have no direct interest in this controversy.

¶ 131    Our opinion should not be read to minimize Jacob's concerns about becoming the biological father of a child born under these circumstances. We recognize the far-reaching consequences of the decision that Jacob made, in a short amount of time and under exigent circumstances, when he agreed to assist Karla in her IVF procedure. Jacob's lack of hesitation in agreeing to help her create the pre-embryos was noteworthy and uncommonly selfless, so much so that Karla herself stated, even after the dispute arose, that she believed Jacob to be "this angel that was put in [her] life to help [her] through this." Jacob's interests in not using the pre-embryos and keeping them frozen, indefinitely, are valid and not insubstantial. Under the unique circumstances in this case, however, Karla's interests in using the pre-embryos to have a biologically related child–given her ovarian failure and inability to create any more pre-embryos with her own eggs, prevail over Jacob's interests in not using them.

¶ 132    Finally, we must acknowledge the remaining elephant in the room–Jacob's concern that he could be financially responsible for any child resulting from the pre-embryos. This issue has not been squarely presented for our disposition, and because we cannot render an advisory opinion, we make no findings on the matter. We note only that this decision should not be construed as a ruling on Jacob's legal status under any applicable parentage or child support statutes. We see no basis in the record why Jacob would be precluded from seeking a legal declaration of his parental status. See 750 ILCS 40/3(b) (West 2012) ("The donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife shall be treated in law as if he were not the natural father of a child thereby conceived.")

¶ 133                    Jacob's Constitutional Claims

¶ 134    Jacob has renewed his arguments from the previous appeal so as to preserve them for further review. This includes his argument that he has a right not to be a parent under both the United States and Illinois Constitutions. To recall, Jacob maintains that "[t]he placement of the pre-embryo inside the woman's body is equivalent to the act of intercourse." He argues that while "IVF and pre-embryo cryopreservation are scientific and technological marvels[,] *** their splendor should not bedazzle the courts into overlooking th[is] basic equivalence." We find no reason to depart from the holding in our prior decision or to question the reasoning contained therein. We thus reaffirm our prior ruling that there is "no constitutional obstacle to honoring an agreement regarding the disposition of pre-embryos, and where there has been no

advance agreement regarding the disposition of pre-embryos, then to balance the parties' interests in the event of a dispute." *Szafranski I*, 2013 IL App (1st) 122975, ¶ 44.

¶ 135                                                    Promissory Estoppel

¶ 136      As a final matter, Karla has argued that, whether there was a contract or not, Jacob should be estopped from preventing her use of the pre-embryos. She argues that this court did not previously rule on whether promissory estoppel could be applied in the absence of an enforceable contract between the parties and that "there is nothing preventing [her] from relying upon this theory." In *Szafranski I*, we adopted a hybrid contract approach for resolving disputes over the disposition of pre-embryos. Under this approach, " '[a]greements between progenitors, or gamete donors, regarding disposition of their pre-zygotes should generally be presumed valid and binding, and enforced in any dispute between them.' " *Id.* ¶ 40 (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).

¶ 137      Our adherence to the contract approach necessarily precludes us from reaching the merits of a promissory estoppel claim. That is not to suggest, however, that factual considerations relevant to promissory estoppel may not be considered by a court in a dispute over the disposition of pre-embryos. To the contrary, we believe that where there has been no advance agreement between the parties, such considerations may be weighed by the court in determining the parties' respective interests in using or not using the pre-embryos. See *id.* ¶ 42. We merely decline to expand our previous ruling to resolve the present dispute under a theory of promissory estoppel based on the facts and circumstances in this case.

¶ 138                                                       CONCLUSION

¶ 139      For the reasons stated, we affirm the order of the circuit court of Cook County granting defendant, Karla Dunston, sole custody and control of the disputed pre-embryos.

¶ 140      Affirmed.

¶ 141      JUSTICE HARRIS, dissenting.

¶ 142      The majority's ruling affirms the trial court's determination that Karla and Jacob had an enforceable oral agreement, formed on March 24, 2010, to allow Karla to use the pre-embryos without qualification. The manifest weight of the evidence is contrary, therefore I do not agree that the parties entered into such an oral agreement and I respectfully dissent.

¶ 143      "The principles of contract state that in order for a valid contract to be formed, an 'offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain.' " *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29 (1991) (quoting 1 Samuel Williston, A Treatise on the Law of Contracts §§ 38 to 48 (3d ed. 1957), and 1 Arthur Linton Corbin, Corbin on Contracts §§ 95 to 100 (1963)). Therefore, one element "essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties" to its material terms. *Trittipo v. O'Brien*, 204 Ill. App. 3d 662, 672 (1990). It follows that the failure of the parties to agree upon a material term indicates a lack of mutual assent and requires a finding here that no enforceable oral contract exists between the parties allowing Karla the exclusive use of the pre-embryos without qualification.

¶ 144        When parties agree to the process of *in vitro* fertilization, one material consideration is the disposition of the frozen pre-embryos in the event the parties are no longer together. As we discussed in our opinion in *Szafranski v. Dunston*, 2013 IL App (1st) 122975, ¶ 41 (*Szafranski I*), the nature of the *in vitro* fertilization process requires "serious discussions between the parties prior to participating in *in vitro* fertilization regarding their desires, intentions, and concerns." Accordingly, the American Medical Association (AMA) has advised that the parties should be in agreement regarding " 'the disposition of frozen pre-embryos in the event of divorce or other changes in circumstances. Advance agreements can help ensure that the gamete providers undergo IVF and pre-embryo freezing after a full contemplation of the consequences ***.' AMA Code of Medical Ethics Op. 2.141 (June 1994)." *Id*. In so stating, the AMA views the subject of pre-embryo disposition not only as significant to the *in vitro* fertilization process, but also as a separate concern the parties need to address.

¶ 145        Karla and Jacob testified that on March 24, 2010, they had a conversation wherein Karla made known her desire to have biological children and Jacob agreed to provide sperm for the *in vitro* fertilization procedure. They also agreed that they never discussed the disposition of the frozen pre-embryos if their relationship were to end. The parties agreed that they made the determination to proceed with the *in vitro* fertilization without much serious discussion of their desires, intentions, or concerns. Notwithstanding, the majority on appeal affirms the trial court's finding that on March 24, 2010, the parties agreed to allow Karla use of the pre-embryos without qualification.

¶ 146        Karla argues that since Jacob never placed limitations on her use of the pre-embryos, it was her understanding that he agreed to let her use them to have a biological child, without qualification. Jacob, however, argues that his silence on the subject of disposition merely reflected the fact that they never brought up or discussed the issue, and he testified that the subject did not even cross his mind at the time. All the testimonial evidence shows that on March 24, there was no meeting of the minds regarding the disposition of the frozen pre-embryos if the relationship were to end. See *Trittipo*, 204 Ill. App. 3d at 672 ("[w]hen it appears that the language used or the terms proposed are understood differently by the parties, there is no meeting of the minds and no contract exists between the parties"). The trial court's finding that an enforceable contract on the disposition of the pre-embryos existed between Karla and Jacob, stemming from their March 24 conversation, is against the manifest weight of the evidence.

¶ 147        The trial court and the majority on appeal find persuasive Karla's contention that by agreeing to donate his sperm to create embryos so that she may have biological children, Jacob agreed to Karla's unconditional use of the embryos for that purpose in the future. However, as discussed above, the question of disposition of the frozen pre-embryos is a material and distinct one from the decision to undergo *in vitro* fertilization. Since there is no evidence that Karla and Jacob agreed on that essential term when they agreed to utilize the procedure on March 24, there can be no enforceable contract regarding the disposition of the frozen pre-embryos.

¶ 148        The trial court and the majority on appeal also found that Karla prevails when applying the balancing of interests approach. However, this approach is not applicable here. We held in *Szafranski I* that courts are to apply the contractual approach to resolve disputes over the disposition of pre-embryos, and in the event the parties did not have an advance agreement regarding disposition, courts should apply the balancing interests approach. *Szafranski I*, 2013

IL App (1st) 122975, ¶ 42. However, that decision did not consider the effects of a consent form signed by the parties which expressly provides for mutual control over disposition of the embryos, as we have here. In fact, when discussing the balancing interests approach as applied by other jurisdictions, we noted that "none of these courts have awarded one party the right to implant pre-embryos in the face of a prior agreement stating that both parties' consents were required to make use of the pre-embryos." *Id.* ¶ 37. We acknowledged the parties' arguments, including Jacob's contention that the informed consent expressed their intent that the embryos not be used without both of their consents. We noted that the parties did not have the opportunity to present evidence in support of their positions in light of the contractual approach, and remanded the cause to the trial court "to apply the contractual approach to any facts previously adduced and to any facts the parties wish to present on remand." *Id.* ¶ 50.

¶ 149    Upon consideration of the evidence presented by the parties on remand, including the signed consent form, I find that the informed consent controls here. The trial court found, and the majority agreed, that the consent form was not determinative of the issue because it contemplated that the parties would form a separate agreement as to the disposition of the pre-embryos. Working under the assumption that the parties agreed Karla should have unqualified control over the disposition, the trial court determined such an agreement took precedence over the informed consent. I, however, do not agree that the parties came to a prior oral agreement as to the disposition of the pre-embryos because no circumstantial or direct evidence supports that finding.

¶ 150    Furthermore, Karla testified that in signing the informed consent she agreed to its terms. She also agreed to its terms as a matter of law because "a party to an agreement is charged with knowledge of and assent to the agreement signed." *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (2006). Karla thus agreed to the provision of the informed consent stating that "no use can be made of the embryos without the consent of both partners (if applicable)." Therefore, I believe the informed consent, signed by Karla and Jacob on March 25, 2010, one day after their conversation, controls. According to the plain and clear language of the informed consent, evidencing the intent of the parties, "[n]o use can be made of these embryos without the consent of both partners (if applicable)." Jacob does not give his consent for Karla to use the embryos. It follows that at this time, "[n]o use can be made of these embryos."

¶ 151    The facts presented before us are indeed unfortunate, and I am mindful of the distressing position Karla would face in light of the determination in this dissent. However, I believe it is the obligation of this court to resolve the issue before us based on relevant, time-tested legal principles rather than standing contract law on its head because of genuine and understandable sympathy for the predicament of one of the parties. It is especially important in cases where the parties are contemplating issues with significant implications, such as creating and bringing a child into the world, that they make their intentions regarding material concerns clearly known and courts make a determination based on the parties' clear intent rather than on evidence of intent that is nonexistent. For all the foregoing reasons, I must respectfully dissent.